SUMMIT COUNTY et al. v. RICH COUNTY.

No. 3545.   Decided January 19, 1921.   Rehearing Denied February
17, 1921.   (195 Pac. 639.)

1.  PLEADING—DEMURRER ADMITS FACTS PLEADED.   A demurrer to
the complaint admits facts pleaded therein.

2.  CONSTITUTIONAL LAW—EVERY REASONABLE DOUBT SOLVED IN
FAVOR OF CONSTITUTIONALITY OF STATUTE.   Before the court can
declare an act of the Legislature unconstitutional, it is its
duty to solve every reasonable doubt in favor of the act.

3.  COUNTIES—COMPLAINT HELD TO SHOW UNCONSTITUTIONAL AT-
TEMPT OF LEGISLATURE TO DEFINE BOUNDARY LINE BETWEEN
COUNTIES.   The complaint in an action between counties held
to sufficiently allege that Sess. Laws 1917, c. 113, passed pur-
suant to Comp. Laws 1907, § 487, attempting to define the
boundary line between Summit and Rich counties, is in vio-
lation of Const. art. 11, § 3, which provides that no territory
shall be stricken from any county except upon a vote of a
majority of the voters in such territory as well as of the county
to which it is annexed.[1]

4.  COUNTIES—LEGISLATURE IN FIXING DISPUTED BOUNDARY LINE
MUST FOLLOW THE STATUTORY DESCRIPTION AS NEARLY AS POS-
SIBLE.   In defining the boundary. line between two counties,
where there is a dispute, it is the duty of the Legislature,
under Comp. Laws 1907, § 487, to follow the statutory descrip-
tion as nearly as practicable; and, if it finds it impracticable
to follow it as to some particular point, then to establish a
new line, but the fact that some parts of the boundary line
may be ambiguous and unascertainable by engineering skill
does not justify it in ignoring altogether that which is clear .
and unmistakable, in view of Const. art. 11, § 3.

Appeal from District Court, Third District, Salt Lake
County; H. M. Stephens, Judge.

Suit by Summit County and South Summit School Dis-
trict against Rich County.   Judgment for defendant, and
plaintiffs appeal.

---

[1] Barton v. Sanpete County, 49 Utah, 188, 162 Pac. 611.

REVERSED and REMANDED, with directions.

*P. H. Neeley,* of Coalville, and *Dey, Hoppaugh & Mark,* of Salt Lake City, for appellants.

*Howat, Marshall, Macmillan & Crow,* of Salt Lake City, for respondent.

THURMAN, J.

This is a proceeding in equity to perpetually enjoin the defendant Rich county, its officers and agents, from exercising, or attempting to exercise, jurisdiction over certain territory alleged to be a part of Summit county, and for other relief. The question presented arises upon defendant's demurrer to the complaint. It therefore becomes necessary to set out the substance of the complaint with reasonable fullness.

The complaint alleges the existence of the plaintiff county since about the year 1876, and defines its area and boundary lines as the same are described in Comp. Laws Utah 1907, § 479, as follows:

"Beginning on the northern boundary of the state at longitude 110 degrees west, thence west to the southwest corner of Wyoming; thence north to a point east of the point where the north side of the Union Pacific Railroad crosses the summit first west of Bear River valley; thence west to the north side of said railroad; thence southwesterly along the north side of said road to a point one mile east of Wasatch Station; thence northerly to the nearest point of the summit of the range of mountains between Bear River and Weber valleys; thence southwesterly along said last-mentioned summit to its intersection with the summit of the high land between Echo and Lost creeks; thence southwesterly down said last-mentioned summit to and directly across the Weber river; thence southerly along the summit of the range separating East canyon from Weber valley to the summit of the cross range through which the upper canyon of East Canyon creek runs; thence westerly to the summit of the Wasatch range; thence southeasterly along said summit to the summit of the range next south of the headwaters of Silver and East Canyon creeks; thence easterly along said last-mentioned summit to the point where it is crossed by the road between Rhodes' valley and Salt Lake City;

thence southerly to the middle of the channel of the Provo river at the high bluff below Goddard's ranch; thence easterly along the middle of said channel to the headwaters of the said river farthest east; then east to the summit of the Uintah range; thence northeasterly to the one hundred and tenth meridian of west longitude; thence north to the point of beginning."

The complaint also alleges the existence of the South Summit school district, one of the plaintiffs, as a legal subdivision of said county, having schoolhouses, and an organized school system and school facilities for the inhabitants. The complaint then alleges the existence of the defendant Rich county since about the year 1876, and defines its area and boundary lines as the same are described in Comp. Laws Utah 1907, § 474, which reads:

"Beginning at the point of intersection of the boundaries of Utah, Idaho, and Wyoming, thence west to the summit of the watershed separating Cache and Bear Lake valleys; thence southerly along the summit of said watershed to the summit of the Wasatch range lying north and east of the headwaters of Ogden river; thence southeasterly along the summit of the last-mentioned range to, and thence along, the summit of the mountains separating the valley of the Bear river from the valley of the Weber river to a point opposite and nearest to the Union Pacific Railroad, one mile east of Wasatch station; thence southerly to the north side of said railroad; thence northeasterly along the north side of said railroad to the summit west of the Bear River valley; thence east to the state boundary; thence north to the point of beginning."

It is then alleged in the complaint that since 1917 defendant has asserted and does now assert and lay claim to a certain portion of the area and territory of Summit county and said school district as follows:

"Commencing at the northeast corner of lot 6, section 4, township 5 north, range 8 east, Salt Lake base and meridian, thence running along the boundary line between the state of Wyoming on the east and the state of Utah on the west, a distance of four miles more or less to a point on said boundary line approximately 600 feet north of the Union Pacific Railroad; thence west on the north side of said railroad a distance of one mile more or less to a point where the said Union Pacific Railroad crosses the summit first west of Bear River valley; thence southwesterly along the north side of said railroad to a point in the northwest quarter of the southeast quarter of section 36, township 6 north, range

7 east, Salt Lake base and meridian, and about one mile easterly of Wasatch Station as formerly situated; thence north 44 degrees west 3,592 feet to the summit of the range of mountains between Bear River and Weber valleys; thence along said last-mentioned summit south 49 degrees 53 minutes west, 1,500 feet; thence along said summit south 60 degrees 06 minutes west, 2,250 feet; thence along said summit south 76 degrees 37 minutes west, 3,292 feet to a point in the northeast quarter of the southwest quarter of section 34, township 6 north, range 7 east, Salt Lake base and meridian; thence south 18 degrees east 3,500 feet to the summit of the Bear river and Weber river watershed; thence in a general easterly direction along the summit of said watershed to a point on the section line between sections 1 and 2, township 5 north, range 7 east, Salt Lake base and meridian, 1,020 feet north to the southwest corner of the northwest quarter of said section 1; thence south 1,020 feet to said southwest corner of the north-west quarter of said section 1; and thence east three and one-half miles, more or less, to the point of beginning."

At this point plaintiff attaches to its complaint, as a part thereof, the following plat or diagram, which it alleges repre-sents the area in conflict, as before described:

The line A-B is plaintiffs' representation of the original boundary line between the two counties; the line A-C is plaintiffs' representation of the line established by the Legislature of 1917.

The complaint then alleges that said portion of said Summit county, last described, has never been stricken from said county by any authority of the state of Utah, or other authority, nor in virtue of a vote therefor by a majority of the voters living in said last described territory, nor of a majority of the voters of the county to which it is to be annexed; nor has any vote ever been taken at any time in respect of the premises; that said last-described territory contains a considerable number of inhabitants and a large part of the taxable and assessable property of said county and school district; that notwithstanding the premises defendant unlawfully assumes to exercise jurisdiction over said inhabitants without their consent and to levy and assess taxes against them and their property situated therein; that defendant denies the lawful authority and jurisdiction of plaintiffs over said territory, and has heretofore brought many suits at law against plaintiff county to prevent said plaintiff from levying, assessing, or collecting taxes in said territory; that said defendant has thereby delayed, hindered, and prevented plaintiff county from collecting its said taxes and having and exercising jurisdiction over said territory and its inhabitants in other respects, and will continue so to do unless restrained by decree of court; that said school district is indebted more than $48,000, for which it has issued its bonds to its creditors, and has other indebtedness besides, and if said territory is stricken from Summit county it would deprive said school district of a large part of its revenue heretofore derived from the taxable property situated therein, and throw the entire burden of said indebtedness onto property and persons remaining in other parts of the district; that both of said plaintiffs would thereby be deprived of a large amount of revenue for school and other lawful purposes; that it would also deprive said school district of other property used by it for school purposes without just compensation or due process of law, con-

trary to the Fourteenth Amendment of the federal Constitution; that the value of said property would exceed the sum of $20,000. The complaint then states with considerable detail that prior to 1898 there was no dispute concerning the boundary line between plaintiff county and defendant, but that since that time defendant has arbitrarily created a dispute with plaintiff county with intent to deprive it of its territory and defraud it of its revenues, and otherwise injure it as above set forth; that in pursuance of said fraudulent intent, in the year 1917, under pretense of having a disputed boundary line more clearly defined between plaintiff and defendant counties, and with intent to evade the provisions of article 11, section 3, of the state Constitution, plaintiff fraudulently represented to the state Legislature that the boundary line between said counties was and is at another place from that which it had always been and now is, and thereupon the said Legislature passed an act which purports to more clearly define an existing boundary line between said counties, but which changed the existing boundary line and made a line which cut off the territory last above described from Summit county and annexed the same to defendant, Rich county, in violation of the provisions of the state Constitution hereinbefore referred to. Finally, it is alleged in the complaint that the Legislature in passing the act referred to assumed and acted in belief that there were apparent ambiguities in the description of the boundaries of said counties as hereinbefore set forth, and was induced to pass said act, and did pass it, because of said mistake and said assumed patent or apparent ambiguities. But plaintiff alleges that in truth and in fact said boundary line is and was clear and definite, and described by natural objects and permanent structures and monuments included therein without any apparent or other ambiguity or uncertainty, and by clear and definite language. It is further alleged that said act of 1917 was passed by the Legislature to change said boundary line as aforesaid without any previous authorized official survey thereof upon the ground theretofore made by authority, or to be made by authority thereafter.

To this complaint defendant interposed a general demurrer which was sustained. Plaintiffs elected to stand upon their complaint, whereupon the complaint was dismissed at plaintiff's costs, and judgment entered for defendant.

Plaintiffs appeal and assign as error the order of the court sustaining the demurrer and the entry of judgment for defendant.

The demurrer admits the facts pleaded in the complaint, and there seems to be little or no dispute as to the law.

Article 11, section 3, of the state Constitution, relied on by plaintiffs and referred to in their complaint, reads as follows:

"No territory shall be stricken from any county unless a majority of the voters living in such territory, as well as of the county to which it is to be annexed, shall vote therefor; and then only under such conditions as may be prescribed by general law."

The binding effect of this provision of the Constitution is not challenged by respondent, but it insists that the facts of this case bring it within the principle announced in *Barton v. Sanpete County*, 49 Utah, 188, 162 Pac. 611. In that case the lands of Barton were assessed for taxes by the officers of Sanpete county. Barton contended that his lands so assessed were in Juab county. He paid the taxes under protest, and brought suit to recover the amount on the theory that Sanpete county had no authority to collect the tax. There had been a dispute of long standing between the two counties as to the exact location, on the ground, of the boundary line between them. In 1907 the Legislature enacted a general law providing for the determination of such disputes. The act appears in the Compiled Laws of 1907, § 487. It is unnecessary to quote it at length, but in substance it provides that if the surveyors of the counties between which the dispute arises cannot agree upon the matter in dispute the county commissioners of either or both of said counties may engage the services of the state engineer, who with the aforesaid county surveyors, or either of them, shall proceed to permanently determine the boundary line by making surveys and directing suitable monuments to designate said boundaries,

which shall be permanent until superseded by legislative en-
actment. In 1908 the state engineer, in pursuance of the act
referred to, went upon the ground and located the points at
which he thought monuments should be placed. The bound-
ary line thus established left Barton's land on the Sanpete
side. This, however, did not settle the dispute. In 1913 Juab
county carried the matter to the Legislature which passed an
act amending Compiled Laws 1907, §§ 469, 477, which defined
the original boundary lines and thereby finally established
the line which had been in dispute. This act is found in Ses-
sion Laws 1913, p. 113. The line established by the Legis-
lature placed the land in Juab county. Barton relied on the
legislative act; the defendant Sanpete county relied on the
survey made by the state engineer, and also contended that
under the constitutional provision (article 11, § 3) relied on
by plaintiffs in the instant case, the Legislature had no power
to take land from one county and give it to another without a
vote of the people, and that therefore the act of the Legisla-
ture relied on by Barton was unconstitutional. The dispute
in that case as to the location of the boundary line between
the two counties is best explained by quoting an excerpt from
the opinion of the court. 49 Utah, at page 190, 162 Pac. 611,
the court says:

"The boundaries of Juab county, as defined by the Legislature,
are found in Comp. Laws 1907, section 469, and those of Sanpete
county are found in section 477 of that compilation. The particu-
lar portion of the boundary line in dispute is described in section
477, supra, as follows: ' * * * To a point east of the place
where the Gunnison road crosses the divide between Chicken
creek and Sevier river; thence in a straight line southwesterly to
the upper bluff rocks at the south end of Cedar ridge.' The lan-
guage describing the boundary in section 469 is practically the
same. The points in dispute are: (1) The precise place or point
where the Gunnison road crosses the divide between Chicken creek
and the Sevier river; (2) the precise point on the mountain range
referred to which lies east of the point first mentioned; and (3)
the precise point that is referred to by the description of 'the upper
bluff rocks at the south end of Cedar ridge.' When the first point
is once found the second is easily determined, since that point
must be found due east of the first point. The third point is,
however, entirely independent of the other two."

The district court found the issues in favor of Sanpete county and its counsel in this court defended the judgment on the ground that the location of the boundary line by the state engineer having been made in 1908, in pursuance of the provisions of section 487, *supra,* the line so established should be confirmed. Counsel also contended, as before stated, that the act of the Legislature establishing the line was unconstitutional.

This court reversed the judgment of the trial court on the theory that the common boundary line between the two counties was so indefinite and ambiguous that it could not be contended that the line had been definitely established until the Legislature established it in 1913. Whether the land in question was in Juab county or Sanpete county could not be determined prior to the passage of the act, and therefore it could not be assumed that land had been stricken from one county and given to another. The court in its opinion, at page 194 of 49 Utah, at page 613 of 162 Pac., says:

"The legal effect of what was done by the Legislature was merely *to determine and fix the originally contemplated territorial limits of the two counties.* No territory was therefore annexed to one, or stricken from the other county, and hence the constitutional provision has no application here." (Italics ours.)

We have reviewed the opinion in the Barton Case at considerable length for the reason that it appears to have been implicitly relied on in the court below in the instant case by both respondent and the trial court. It is also relied on here, and in fact is the only case called to our attention that is in any respect analogous to the case at bar. The opinion in that case is comparatively brief, and its purport and meaning clear. It is apparent upon a careful reading of the opinion, especially the language italicized in the excerpt quoted, that this court upheld the legislative act of 1913 because the legal effect of what the Legislature did was, as stated, "merely to determine and fix the originally contemplated territorial limits of the two counties."

In the present case the trial court rendered an able and exhaustive opinion, which is adopted by respondent and printed in its brief as part of its argument. It compares the

alleged uncertain boundary line in the Barton Case with the alleged uncertain boundary line in the present case, and finds that in principle the conditions are similar. For that reason the trial court seemed to be of the opinion that the boundary line in dispute in this case, the same as in the Barton Case, is hopelessly indefinite, and therefore justified the legislative act establishing a new line. Without assuming or attempting to differentiate the facts between the Barton Case and the case at bar, it is sufficient for our purpose to say that if it had appeared in the Barton Case, upon a comparison of the original boundary line, with the boundary line established by the Legislature in 1913, that the Legislature had manifestly ignored a plain indubitable line marked by a transcontinental railroad for a distance of approximately four miles, thereby shifting the railroad from one county to another, together with thousands of acres of land and their inhabitants, the writer is of the opinion that the court would have held that the act was unconstitutional and void. The hypothesis we have assumed appears to be within the facts of the present case as the same appear in plaintiff's complaint.

It is not our province on this appeal to determine, or attempt to determine, the exact location of the true boundary line at all points between the two counties. For that reason we have not referred to the alleged uncertainty as to where the common boundary line on the north leaves the Wyoming state line and starts west towards the north side of the railroad. Neither have we referred to the alleged uncertainty as to where the boundary line leaves the railroad on the south. Any opinion we might express upon questions of that kind would serve no useful purpose. The question here is, Does plaintiffs' complaint state a cause of action? We think the complaint conclusively shows that the legislative act of which plaintiffs complain unnecessarily deprives Summit county of a substantial portion of its territory, and for that reason the trial court erred in sustaining defendant's demurrer.

We are not unmindful of the fact that before we can declare an act of the Legislature unconstitutional it is

our solemn duty to solve every reasonable doubt in        **2**
favor of the act. We have conscientiously endeavored
to adhere to that rule in arriving at a conclusion in the pres-
ent case. We cannot, however, close our eyes to the fact that
the Legislature which originally defined the boundary line
between Summit and Rich counties, according to the com-
plaint, manifestly intended that the north side of the Union
Pacific Railroad should constitute the boundary line between
the two counties for a distance as above stated of approx-
imately four miles. It also manifestly intended that for that
entire distance said railroad should be within and a part of
the territory of Summit county and subject to its jurisdiction.
The fact that other parts of the boundary line between the
two counties may be ambiguous or unascertainable by engi-
neering skill did not justify the Legislature in ignor-
ing altogether that which was clear and unmistakeable.     **3, 4**
It was the duty of the Legislature in attempting to
establish the boundary line to follow the statutory descrip-
tion as nearly as practicable, and, if it found it impracticable
to follow it at some particular point, then to establish a new
line. In doing so however, it was still its duty to be guided
by what it conceived to be the intention of the Legislature
which attempted to establish the original line.

We are therefore compelled to hold that the act of the Leg-
islature (chapter 113, Sess. Laws 1917) attempting to define
the boundary line between Summit and Rich counties is in
violation of article 11, section 3, of the state Constitution, and
is therefore void.

The judgment of the trial court is therefore reversed, and
the cause remanded to the district court, with directions to
overrule the demurrer to plaintiff's complaint and to proceed
in accordance with the usual practice of the court.

CORFMAN, C. J., and WEBER, GIDEON, and FRICK,
JJ., concur.

### On Rehearing.

THURMAN, J. On application for rehearing respondent

expresses the fear that the opinion of the court may be construed as holding, unqualifiedly, that the legislative act, ch. 113, Laws Utah 1917, is unconstitutional.

The court is of the opinion that the language used, considered as a whole, is not susceptible of such construction. The sufficiency of the complaint was all that was before the court and the court only intended to hold that the complaint showed the act to be unconstitutional. With this explanation the application for rehearing is denied.

CORFMAN, C. J., and WEBER, GIDEON, and FRICK, JJ., concur.